## BATES *a.* THE NEW ORLEANS, JACKSON & GREAT NORTHERN RAILROAD COMPANY.

*Supreme Court, Seventh District; General Term, Dec.* 1856.

FOREIGN CORPORATION.—SERVICE OF SUMMONS.—ATTACHMENT.

Although, by section 427 of the Code, it is essential to the jurisdiction of a court of this State over a foreign corporation, that either the plaintiff should be a resident of this State, or the cause of action should have arisen, or the subject of the action should be situated within it, yet it is not necessary, to the validity of proceedings against a foreign corporation, that proof of either of these facts should have been made previous to the commencement of proceedings.

It is sufficient if a state of facts which sustains the jurisdiction, is made to appear upon motion to set the proceedings aside.

Section 134 of the Code, in authorizing service of summons upon a foreign corporation, to be made by delivering a copy to an officer of the corporation, simply provides a substitute for service by publication.

The case of Hulbert *a.* The Hope Mutual Insurance Company (4 *How. Pr. R.,* 275), approved.

To sustain the service of a summons upon a foreign corporation, under section 134 of the Code, it must appear that such corporation owned, within this State, at the time of service, property such as was liable to be taken by attachment under sections 227—242.

A foreign corporation contracted with a manufacturer in this State, for certain articles to be made for them, and delivered to them at New Orleans, the corporation to pay the charges of transportation. The articles were made within this State, and here delivered to an express company, directed to the corporation at New Orleans. *Held,* that the title did not pass to the corporation until delivery to them at New Orleans; and that, consequently, the goods were not liable to be attached in a suit against the corporation, during their transit to the border of the State.

A claim, contingent upon the happening of a future event, is not, while the contingency lasts, a debt, liable to attachment.

A debt due from a debtor not within this State, to a creditor also not within the State, is not liable to attachment here, although the *evidence of debt—e.g.,* the bond, note, &c.—may be within the State.

Motion to set aside service of summons and all subsequent proceedings.

This motion was heard in the first instance at general term, under an order to that effect, made at special term by Mr. Justice Smith. The facts upon which the motion was based, appear in the opinion of the court.

*Ashbell Green,* for the motion.—I. An action is not commenced until the *service* of the summons is made. No matter when the summons may be dated, no matter what auxiliary proceedings may have been commenced or attempted, the action is not for any purpose commenced until the summons is served. (*Code,* § 99, *subd.* 1, § 127.) This construction of the sections cited, does not conflict with subdivision 2 of section 99,—providing that an attempt to commence an action shall be deemed equivalent to the commencement thereof, " within the meaning of this title." That provision is limited to the matters treated of in Title 2—the Limitations of Actions (Mills *v.* Corbett, 8 *How. Pr. R.,* 501); and its terms, moreover, are inapplicable to an action against a foreign corporation. Neither does it conflict with section 139, which, in effect, provides only, that should the court acquire jurisdiction at all, it shall have power over its own process from the time of allowing a provisional remedy ; and thus only grants a provisional lien on the property, provided the jurisdiction be acquired. (Moore *v.* Thayer, 6 *How. Pr. R.,* 48 ; Burkhalt *v.* Sandford, 7 *Ib.,* 329.) In the present case, the summons was not *served* until August 9, and that is, therefore, the earliest day at which the action can be claimed to have been commenced. There must appear to have been jurisdiction upon that day, or the service of the summons is ineffectual.

II. The service of summons in actions against foreign corporations, is specially provided for and restricted. Whether it be served by delivery to an officer of the corporation within the State, or by publication, the service is only effective when the

corporation has property "within this State, or the corporation arose therein." (*Code*, §§ 134, 135, as amended 1851; compare, also, Eggleston *v.* The Orange Railroad Company, 1 *Code, R. N. S.*, 212; Day *v.* The Newark India Rubber Manufacturing Company, 1 *Blatchf. C. C. R.*, 628.)

III. The plaintiff was 'not,' at the time of commencing this action, a resident of this State; which is essential to the jurisdiction of the court over this case. (*Code*, § 427, *subd.* 1.) Such residence is not alleged in his affidavit upon which he sued out his attachment, and the contrary is shown in the affidavits read on behalf of defendants. Moreover, the omission to state the residence of the plaintiff, in the original affidavit, was fatal. (Staples *v.* Fairchild, 3 *Comst.*, 41; Payne *v.* Young, 4 *Seld.*, 158.)

IV. The defendants had not, on August 9, the day of the attempted service, any property within this State. The existence of property within this State, belonging to the defendants at the date of service, is essential to the validity of the service.—1. By the express terms of the Code (§ 134). 2. By the general principle that a suit is not to be carried on in any court without jurisdiction, either of the person of defendant, or of some property by means of which the judgment can be made available. (McQueen *v.* The Middletown Company, 16 *Johns.*, 6; Hulbert *v.* The Hope Mutual Insurance Company, 4 *How. Pr. R.*, 279; Brewster *v.* The Michigan Central Railroad Company, 5 *Ib.*, 183.) For if the defendant is not within the jurisdiction, the judgment creates no liability against the person. (Oakley *v.* Aspinwall, 4 *Comst.*, 520.) And if he has no property within the jurisdiction, the suit cannot affect any property. (Fenton *v.* Garlick, 8 *Johns.*, 194; Borden *v.* Fitch, 15 *Ib.*, 121; Holbrook *v.* Murray, 5 *Wend.*, 160; Holmes *v.* Remsen, 20 *Johns.*, 229; Shumway *v.* Stillman, 6 *Wend.*, 447; Hulbert *v.* The Hope Mutual Insurance Company, 4 *How. Pr. R.*, 277; *Story's Confl. of Ll.*, § 546.) Hence the proceedings would be idle.

V. The property relied upon as being within this State, on August 4, 1855, was not so, within the meaning of the Statute, even if the test were to be applied as of that day. As to the lamps, no title to them had vested in the defendants. As to the bonds, they were not liable to attachment, for several reasons, 1. They were bonds of the city of New Orleans, and other bonds of the State of Louisiana, all payable to the defendants. The

person in possession of the bonds was the president himself, not an agent or other person whose possession created a debt or obligation, to account for the bonds. He was a mere servant, and the possession was that of the defendants themselves. (Peckham *v.* North Parish, 16 *Pickering*, 286; McQueen *v.* Middletown Company, 16 *Johns.*, 6; *Ang. on Corp.*, 576.) 2. This property was not such as could be attached or taken in execution under process of this State, and this is the test as to the locality of the property. By section 235 of the Code, the attachment of shares of stock, debts, &c., must be by certified copy delivered to the corporate officer, or to the debtor or individual holding the property; together with a notice as prescribed. In the present case, the president was not subject to service, the attachment not being of corporate shares. Nor was service on either of the debtors—*viz.* the city of New Orleans, or the State of Louisiana—possible. Nor was the president an individual holding the property within the meaning of section 235, because the holding was not by him as an individual; and the notion of attaching a debt without notice to the debtor, by a notice to a bailee or servant holding merely the evidence of debt, is absurd. 3. Moreover, no judgment on the attachment could be enforced against either the city of New Orleans or the State of Louisiana. The debts are debts owing by one foreigner to another. Neither debtor nor creditor is within the jurisdiction. Debts have no *situs*, but follow the domicil of the creditor. (Tingley *v.* Bateman, 10 *Mass.*, 343; Kidder *v.* Packard, 13 *Ib.*, 82; Danforth *v.* Perry, 3 *Metc.*, 564; *Story's Confl. of Ll.*, §§ 362, 399.) 4. The provisions as to executions on the judgment (*Code*, § 237), would only apply to property attached. 5. As to the lanterns relied upon as having been the property of defendants within this State, on August 9, they were not the property of defendants at any time within this State, nor until their delivery to the defendants at New Orleans.

VI. No property being attached, the plaintiff could have no judgment. (Thomas *v.* The Merchants' Bank, 9 *Paige*, 218; Hulbert *v.* The Hope Mutual Insurance Company, 4 *How. Pr. R.*, 279, 415; Brewster *v.* The Michigan Central Railroad Company, 5 *Ib.*, 183.)

*J. H. Martindale*, opposed.—I. The residence of the plaintiff

is not required by the Code to be stated in the affidavit to obtain the warrant of attachment.

II. The bonds were held in the possession of the corporation. Their president held them as president and not as an individual; and being held as property of the defendants on August 4, when the suit was commenced, the court had jurisdiction.

III. As to the lanterns, they were in the possession of the defendants in this State, when suit was commenced. Delivery to carrier is delivery to the vendee (*Story on Sales*, § 306).

IV. The bonds are seizable under the attachment. They are choses in action, and are property (*Code*, §§ 463, 464); and the attachment covers all "property" (*Code*, § 227). The court will direct a way to satisfy the judgment out of them. This is a remedial statute, given to secure our own debtors, and will be construed to give effect to its provisions.

V. The Code now authorizes actions *in personam* against foreign corporations, whenever personal service is made on an officer in this State (*Code*, §§ 133, 134).

WELLES, J.—The defendants are a foreign corporation, created under and by virtue of the laws of the States of Louisiana and Mississippi. Their office and place of business has always been in the city of New Orleans, where all their officers reside, and where all their books and papers are kept. The summons is in the ordinary form under the Code for the commencement of an action for the recovery of money upon contract, and was served personally upon John Calhoun, the president of the corporation, at the city of New-York, on August 9, 1855, at about 6 o'clock, P. M., of that day.

The present motion is founded upon the following alleged facts, viz.:—1. That the plaintiff was not a resident of this State when the action was commenced. 2. That at the time of the commencement of the action, the defendant had no property within this State, and that the alleged cause of action did not arise therein.

The Code (§ 127) provides that civil actions shall be commenced by the service of a summons. By section 134, it is provided that if the action be against a corporation, the summons shall be served by delivering a copy thereof to the president or other head of the corporation, secretary, cashier, treasurer, a

director, or managing agent thereof; *but such service can be made in respect to a foreign corporation, only when it has property within this State, or the cause of action arose therein.* By section 427, an action against a corporation created by, or under the laws of any other State, government, or country may be brought in the Supreme Court, &c., in the following cases:— 1. By a resident of this State for any cause of action. 2. By a plaintiff, not a resident of this State, when the cause of action shall have arisen, or the subject of the action shall be situated within this State. By section 227, the plaintiff may have the property of the defendant, being a foreign corporation, non-resident, or absconding or concealed debtor, attached, at the time of issuing the summons, or at any time afterwards.

There was no proof made before, or at the time of the service of the summons, concerning the residence of the plaintiff, nor showing that the cause of action arose, or that the subject of the action was or is situated in this State; and the defendant's counsel now contends that such omission renders the service of the summons irregular and void. But we think the regularity of the service of the summons does not depend upon proof being previously made of the facts, the existence of which is necessary to give the court jurisdiction of the action. The Code nowhere requires such proof to be made, or that any evidence shall be given relating to such facts. Their existence must be determined upon the evidence furnished on this motion.

Any judgment which plaintiff might obtain will be of no value to him in case the defendant should not appear to the action, and submit to the jurisdiction of the court, unless he has attached or shall be able to attach property of the defendant in this State before judgment. Such judgment would be *in rem*, and not, as we think, *in personam.* The law has not been changed, in regard to the character or effect of a judgment against a foreign corporation, since the decision of the case of Hulbert *v.* The Hope Mutual Insurance Company (4 *How. Pr. R.*, 275), the doctrine of which we approve. The section of the Code above referred to, authorizing the service of the summons on the president, &c. of a corporation, is, in our judgment, simply a substitution of that mode for a service by publication, as provided in section 134. It is not necessary to inquire whether any property of the defendants has been legally attached in this

action, because, as we have seen, it is competent for the plaintiff, by section 227, to attach such property hereafter, if he shall discover any.

This brings us to the questions of fact, involving the jurisdiction of the court to entertain the action, and upon which the validity of the service of the summons depends.

The plaintiff's counsel does not contend that the cause of action arose, or that the subject of it is situated in this State; but he claims that the evidence establishes:—1. That at the time of the commencement of the action he was a resident of this State; and, 2. That at the same time the defendants had property in this State. These two propositions are denied on the part of the defendants. They must both be determined in favor of the plaintiff, or it will follow that the service of the summons was irregular and should be set aside.

In regard to the first proposition, it is clear upon the evidence, that the plaintiff has resided in this State since prior to the month of August, 1855, embracing the time of the service of the summons, which was on August 9, of that year. It is satisfactorily shown, that although he resided in the State of Louisiana in the year 1854, and for some time previously, yet that he removed to the city of Rochester in this State in the fall of that year, and has resided in the latter place ever since. It remains to consider whether the evidence establishes that at the time of the service of the summons the defendants had property in this State.

The plaintiff claims that at that time the defendants were the owners of six locomotive lamps, worth $85, each of which were in this State at the time in question, and also that at the same time they had a large amount of bonds of the State of Louisiana and of the city of New Orleans, which were in this State at the same time.

The meaning of section 134 of the Code, in relation to the service of a summons upon the president, &c. of a foreign corporation, having property in this State, is, that the property must be such as may be taken by virtue of an attachment in pursuance of section 227 and other sections in the same chapter (Danforth *v.* Penny, 2 *Metc. R.*, 564).

In regard to the lamps, the affidavits show the following facts: That shortly previous to August 9, 1855, John Calhoun, as presi-

dent of the defendant's Company, and having sufficient authority for that purpose, contracted with Austin Olcott of the city of Rochester, who, with Milton Olcott, were manufacturers of locomotive lamps in Rochester, to send to the defendants, at the city of New Orleans, six lamps, commonly called Olcott's locomotive engine lamps, at the price of $85 each, and of that value, to be forwarded by Olcott to the defendants, and to be paid for by them at New Orleans upon their delivery there; the defendants also to pay the expense of transporting the lamps from Rochester to New Orleans, and Olcott to guarantee their safe arrival at the latter place. That in pursuance of such contract, the six lamps were, on August 9, before two o'clock in the afternoon, by directions of Austin Olcott, packed and delivered at an express office in Rochester, directed to the defendants at New. Orleans. That the lamps passed through the city of New-York, and were seen there on the 10th or 11th of the same month of August, on their way to New Orleans, where they were received and paid for, together with the express charges, by the defendants, pursuant to contract.

Under these circumstances the title of the lamps remained in Olcott until they arrived at New Orleans, and were paid for by the defendants. It was a mere contract for a sale of the lamps, payable on delivery, and the defendants did not acquire the title until the lamps were delivered to and paid for by them. If they had been lost or destroyed on their transit, the defendants would in no event have been entitled to call on the express company for damages; and it would be preposterous to say the lamps were liable, while on their passage through this State, to be taken on an attachment against the defendants (Andrew *v.* Dieterich, 14 *Wend.*, 31; Malcom *v.* Loveridge, 13 *Barb. S. C. R.*, 372–376; *Angel on Carriers*, §§ 495, 496).

With respect to the bonds of the city of New Orleans, and of the State of Louisiana, the facts established by the evidence are as follows:—On and previous to Aug. 4, 1855, there were in the hands of Frost & Forrest of the city of New-York, belonging to the defendants, two hundred and thirty-nine bonds of the city of New Orleans for $1,000 each, which, by direction of the defendants, had been sent from London to Frost & Forrest to be forwarded by them to the defendants at New Orleans. These bonds were made and issued by said city of New Orleans, pay-

able to the New Orleans, Jackson & Great Northern Railroad Company (the defendants), or their assigns, at the office of the city treasurer of the city of New Orleans, in twenty years from their date, with interest at the rate of six per centum per annum, semi-annually, on the first days of May and November in each year, on the delivery of the interest-coupons attached, in the city of New-York, at such bank as the comptroller of the city of New Orleans should direct. The bonds were dated May 1, 1854. On August 4, 1855, Calhoun, the defendants' president, being in the city of New-York on his way to Europe, and being authorized so to do, received the said New Orleans city bonds from Frost & Forrest, and caused them to be inclosed in four packages addressed to J. Henry Schroder & Co., London, which packages so addressed and inclosing said bonds were deposited in the post-office in the city of New-York on August 4, to be sent by regular course of mail to the said Schroder & Co. The packages with the bonds inclosed were afterwards, by due course of mail, received by Schroder & Co., in London. It does not appear at what particular time the bonds left the city of New-York after they were so deposited in the post-office, nor whether on, or before, or after the 9th day of the said month of August. One hundred and thirty-one Louisiana State bonds for $1,000 each, belonging to the defendants, which had been pledged in New Orleans to the Bank of Louisiana as security for the payment of a note drawn by the defendants for $100,000, which said bank had discounted, had, at the request of the defendants, been placed by said bank, on or before August 2, 1855, in the hands of A. E. Silliman, cashier of the Merchants' Bank, New-York, with instructions to deliver the one hundred and thirty-one last-mentioned bonds to Calhoun, for the defendants, on his paying him, Silliman, the $100,000 due from the defendants to the Bank of Louisiana.

One hundred and thirty-three other Louisiana State bonds for $1,000 each, belonging to the defendants, which had been pledged in New Orleans to the New Orleans Canal and Banking Company, as security for the payment of a note drawn by the defendants for $100,000, which said Company had discounted, had, at the request of the defendants, been placed by said Banking Company, on or before August 4, 1855, in the hand of Matthew Morgan & Son, New-York, with instructions

to deliver the said one hundred and thirty-three State bonds last mentioned, to said Calhoun, for the defendants, on his paying said Morgan & Son the $100,000 due from the defendants on said last-mentioned note to the said Banking Company.

These State bonds were issued by the State of Louisiana, under a law of that State, payable to the order of the defendants in forty years, in the city of New Orleans, with interest, at the rate of six per centum per annum, payable semi-annually, in the city of New Orleans, on the first days of May and November of each year, upon the delivery of the interest warrants annexed. The bonds were dated November 1, 1854, and were transferable by endorsement.

On August 2, 1855, the said Calhoun, acting in behalf of the defendants, and having authority from them, sold to Wm. Hoge & Co., of the city of New-York, the two hundred and sixty-four Louisiana State bonds, before-mentioned, for ninety-five cents on the dollar, or $250,800 in all. Said Hoge & Co. paid for them as follows:

| | |
|---|---:|
| August 2, 1855, cash, - - - - - | $100,000 |
| " 4, " " - - - - - | 100,000 |
| " 4, " order on J. Robb & Co., New Orleans, which was paid, - | 50,800 |
| | $250,800 |

On August 2, 1855, Calhoun paid Silliman for the note of the defendants, which had been discounted by the Bank of Louisiana, the first $100,000, received from Hoge & Co., and Silliman surrendered the said one hundred and thirty-one Louisiana State bonds, which Calhoun delivered to Hoge & Co., on August 2, 1855.

On August 4, 1855, said Calhoun paid Morgan & Son for the defendants' note of $100,000, which had been discounted by the New Orleans Canal & Banking Company, the second $100,000 received from Hoge & Co.; and Morgan & Son surrendered the one hundred and thirty-three Louisiana State bonds in their hands, as aforesaid, which Calhoun delivered to Hoge & Co. on August 4, 1855. It was further agreed, between Hoge & Co. and Calhoun, that the former should sell the two hundred and sixty-four Louisiana State bonds, and if they produced more than ninety-five cents in the dollar, with commission and broker-

age of $\frac{5}{8}$ per cent. and 7 per cent. interest per annum, the surplus was to be paid to the defendants; if they produced less, the difference was to be refunded to Hoge & Co. by the defendants. It also appears that, subsequently, the two hundred and sixty-four bonds last mentioned were sold by Hoge & Co. for less than ninety-five cents in the dollar, with the said $\frac{5}{8}$ per cent. commission and brokerage and the said interest, and that the defendants owe said Hoge & Co. for the deficiency. But it does not appear at what time the said bonds were so sold by the said Hoge & Co.

It will be seen that the two hundred and sixty-four State bonds were all sold by the defendants to Hoge & Co., and the title of the former passed to the latter as early as August 4, 1855, five days before the service of the summons upon Calhoun. After that sale, the defendants had no legal interest in them: all the claim they had connected with them was contingent, depending upon the amount for which the bonds should be sold by Hoge & Co.; and that claim has never became absolute, but, on the contrary, it is shown to have no existence in fact, the bonds having been sold for less than ninety-five cents in the dollar, with commission, brokerage, and interest, as provided in the defendants' contract with Hoge & Co. While the contingency lasted, it was not a debt belonging to the defendants which could be attached. Section 231 of the Code makes it the duty of the sheriff, to whom an attachment is delivered, to attach and safely keep all the property of the defendants within his county. In the case of attaching a debt due the defendants, the sheriff is to execute the attachment by leaving a certified copy thereof with the debtor, with a notice showing the property levied on (§ 235). This contingent claim could not be regarded a debt within the sense of the section referred to. The proceeds of the sale of these bonds to Hoge & Co. were not, at the time the summons was served, property of the defendants within this State :—$200,000 of such proceeds was paid by Calhoun in liquidation of debts owing by the defendants, and the remaining $50,800 was paid by Hoge & Co. on an order by J. Robb & Co. of New Orleans, which was duly paid by the latter to the defendants in the latter place. The $200,000 had passed from the defendants on and before the 4th of August, and the order on Robb & Co. was made on that day. The order was sent

by Hoge & Co. to New Orleans, but it does not expressly appear at what time. Nothing whatever is shown in the affidavits read on behalf of the plaintiff, touching the time the order was sent; and the presumption is that it was sent immediately. This would be the natural order and manner of transacting the business, as it was a sale of the bonds for ready pay. The order was *paid* by Hoge & Co., on account of the purchase of the bonds, on the 4th of August. This could not have been done on that day, if they retained the order in their own hands. If the order was not sent by Hoge & Co. before the 9th of August, it was competent for the plaintiff to have proved it; on this point, the *onus* lay on him. Hoge & Co. were competent witnesses, by whom the fact might have been proved, and the above presumption rebutted, if the order was retained until the 9th of August.

It is no answer to this suggestion, that Hoge was requested to make an affidavit, and declined, because his deposition could have been obtained under the provisions of the Revised Statutes. (2 *Rev. Stats.*, 254, §§ 24, 25.) An affidavit read in behalf of the plaintiff, shows, in substance, that Hoge declined to become a volunteer witness, but expressed his willingness to testify when legally required.

In regard to the New Orleans city bonds, we are of the opinion that they were not subject to any attachment issued in this action, on or after August 9, 1855. They had been, on the 4th day of that month, inclosed in packages addressed to Schroder & Co., London, and deposited in the Post-Office in the city of New-York. They were then beyond the reach of process against the defendants. Whether they actually remained in New-York until the 9th, could be shown as easily by the plaintiff as by the defendants, if that were material. An attachment could not have been executed upon them for the further reason, that the sheriff could not have left a certified copy of the warrant of attachment with the obligor, which was the city of New Orleans, and beyond the jurisdiction of the sheriff. In respect to these bonds, the city of New Orleans was the debtor, and the defendants the creditors, and the debts arising upon the bonds could not be said to exist in this State. Contracts and debts are treated as having no *situs* or locality, and they follow the person of the creditor, who, as well as the debtor in the case of all these

bonds, State as well as city, were out of the State of New-York. (*Story's Confl. of Ll.*, §§ 362, 399 ; Tingley *v.* Bateman, 10 *Mass.*, 343, 347.)

This last position applies with equal force to the $50,800, the amount of the order of Hoge & Co. on Robb & Co., and also to the alleged contingent claim of the defendants upon the former, above considered, and is, as it seems to us, conclusive against the plaintiff in relation to them all.

For the foregoing reasons, we think the summons, and all other proceedings by the plaintiff, should be set aside, with ten dollars costs.

Order accordingly.

---

## THE COLONIAL LIFE ASSURANCE COMPANY *a.* THE BOARD OF SUPERVISORS OF NEW-YORK.

*Supreme Court, First District; Special Term, December,* 1856.

### TAXES.—MANDAMUS.—POWER OF SUPERVISORS.

After the taxes are assessed in the city of New-York, and warrants are issued and delivered to the Receiver, the Board of Supervisors have no further control over the assessment rolls, and cannot thereafter strike a name from them.

A mandamus will not be granted when it would be unavailing from a want of power in the defendants to perform the required duty.

The power of the supervisors of New-York, upon application made to them within six months after the tax-rolls are delivered to the Receiver, to remit or reduce a tax, is discretionary with them ; and they are the judges of the cause shown.

If an affidavit is furnished to the supervisors (pursuant to 1 *Rev. Stats.*, 416, § 9), by a corporation, showing that it is not in receipt of any profit or income, it is the duty of the Board to strike the name of such corporation out of the assessment rolls ; and a mandamus lies to enforce this duty.

But if such affidavit is not furnished, the assessment of such corporation is conclusive evidence that the corporation was liable to taxation, and was duly assessed.

Application for a mandamus to the Board of Supervisors to direct them to erase the name of the relators from the assessment roll for the year 1856.